### NATIONAL RECOVERY TECHNOLOGIES, INC., Plaintiff–Appellant,

v.

### MAGNETIC SEPARATION SYSTEMS, INC. and Garry R. Kenny, Defendants–Appellees.

No. 98–1134.

United States Court of Appeals, Federal Circuit.

Feb. 4, 1999.

John J. Feldhaus, Foley & Lardner, of Washington, DC, argued for plaintiff-appellant. With him on the brief were George E. Quillin, Glenn Law, and Pavan K. Agarwal.

Mark J. Patterson, Waddey & Patterson, of Nashville, Tennessee, argued for defen-

dants-appellees. With him on the brief was Edward D. Lanquist, Jr.

Before RADER, SCHALL, and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

## DECISION

National Recovery Technologies, Inc. ("NRT") appeals from the October 29, 1997 judgment of the United States District Court for the Middle District of Tennessee, No. 3–96–0154, granting summary judgment to Magnetic Separation Systems, Inc. and Garry R. Kenny (collectively "MSS"). The district court held that claim 1 of U.S. Patent No. 5,260,576 ("the '576 patent") was invalid for lack of enablement under 35 U.S.C. § 112, paragraph 1 (1994). We affirm the decision of the district court.

## BACKGROUND

NRT is engaged in the manufacture and sale of large-scale automated recycling equipment and systems. NRT is also the assignee of the '576 patent, issued on November 9, 1993, entitled "Method and Apparatus for the Separation of Materials Using Penetrating Electromagnetic Radiation." The '576 patent addresses the problem of separating recyclable plastic materials that are virtually indistinguishable to the human eye by using penetrating electromagnetic radiation.

In recycling plastics, it is often useful to separate plastics with similar chemical compositions. A common sorting problem in the recycling industry is the separation of polyvinyl chloride ("PVC") containers from polyester ("PET") containers. PVC and PET containers are similar in appearance and are difficult to separate manually.[1] However, PVC and PET containers have different chemical properties (hence the desire to separate them) and thus absorb different amounts of electromagnetic radiation (e.g., x-ray) when irradiated. It is generally well known that PVC containers absorb more electromagnetic radiation than PET containers for an equivalent material thickness. The difference in the ability to absorb for each of the materials can be used to differentiate between the two types of plastic. It is assumed that a high transmittance reading (low absorption) indicates a PET container, and a low transmittance (high absorption) reading indicates a PVC container.

According to the '576 patent, the prior art systems suffered from two drawbacks. First, the prior art systems were only able to scan and classify one container at a time, greatly slowing the processing of containers. Second, the prior art systems were not able to differentiate between radiation that passed through thicker portions of the containers, such as the neck and base, and radiation that passed through the central portions of the containers.

In the separation process disclosed in the preferred embodiment of the '576 patent, containers to be sorted are advanced along a conveyor wide enough to accommodate several containers. Each container is irradiated with a sheet-like beam of electromagnetic radiation as it progresses along the conveyor. A number of detectors spanning the width of the conveyor are positioned below the containers to measure the intensity level of electromagnetic radiation that passes through each of the containers. The patented process then uses a microprocessor to compare the detected values to preset thresholds to classify the container as being made of one type of plastic or another. The containers are then mechanically separated on this basis. If the container is classified as one type of material (e.g., PVC plastic), the container is permitted to fall off the end of the primary conveyor onto a second conveyor. If the container is classified as a second type of material (e.g., PET plastic), air valves located at the end of the primary conveyor are activated, thereby directing the container onto a third conveyor. The '576 patent states that this process is able to classify and separate up to eighty containers per second.

---

1. Manufacturers of plastic containers in the United States have begun imprinting the base of most plastic containers with identification codes indicating the chemical composition of the container thereby enabling the containers to be sorted manually. However, the '576 patent states that this process has not found widespread use because it is slow, labor-intensive, and expensive.

However, the '576 patent recognizes that containers cannot be accurately separated simply upon the assumption that detecting a low transmittance indicates a PVC container and detecting a high transmittance indicates a PET container. Where the PET container is significantly thicker than the PVC container, or where the electromagnetic radiation passes through many layers of PET plastic before detection, the detected transmittance level can be similar to, or even lower than that of a PVC container. This can potentially cause a PET container to be misclassified as a PVC container.

There are often irregularities in container thickness due to both the shape of the container [2] and the fact that many containers are folded, crushed, or otherwise mangled by the time the containers enter the separation stage of the recycling process. These irregularities may result in a substantial variance in the thickness of the material through which the electromagnetic radiation passes. The variance in thickness may in turn cause the detected radiation transmittance to vary significantly depending on the section of the container irradiated and measured. As a result, the irregularities and variances in container thickness could cause a PET container to be erroneously classified as a PVC container where the detected transmittance level is reduced because the electromagnetic radiation passed through an abnormally thick portion of the container before detection.

The '576 patent specifically addresses the problem of misclassification due to irregularities in container thickness. The written description of the '576 patent discloses that containers are to be irradiated at several points along their length. Thus, several intensity measurements are recorded for each container. A microprocessor connected to the detectors compares the transmittance measurements for different portions of a particular container to one another, and a subset of the highest readings are selected for processing. The measurements selected are presumed to be measurements of electro-

magnetic radiation energy that did not pass through an irregularity. The selected measurements are compared to preset threshold values in order to classify the containers as being made of either PET or PVC plastic. The containers are mechanically separated on this basis as described above.

However, given the unpredictability of container orientation and possible damage to a container's "regular" portions, results of this process are not completely accurate in distinguishing between containers of differing materials. If a container is folded several times, or is severely deformed by the time it reaches the scanning process, even those measurements with the highest transmittance intensity may have been taken through irregular portions, thereby leading to a potentially erroneous classification. The ideal solution, therefore, is to ensure that only the regular portions of the container are measured and to use only these measurements in classifying the container.

Claim 1 is the only independent claim at issue in this appeal. It reads as follows:

A method of distinguishing and separating material items having different levels of absorption of penetrating electromagnetic radiation, comprising the steps of:

(a)  conveying a plurality of said material items in a random manner simultaneously and longitudinally along an elongated feed path;

(b)  establishing a transverse region across said feed path irradiated by a sheet of penetrating electromagnetic radiation;

(c)  irradiating said plurality of material items in said transverse region with said penetrating electromagnetic radiation;

(d)  simultaneously measuring the amount of penetrating electromagnetic radiation passing through each material item in said transverse region at any instant of time as said items are continuously conveyed longitudinally through said trans-

---

2.  Generally, the neck, cap and bottom of a plastic container are made of significantly thicker plastic than the sidewalls. The detected intensity of the transmitted electromagnetic radiation will therefore vary depending on which section of the container is irradiated. Further, containers may also be folded, thereby increasing the thickness of the plastic material through which the electromagnetic radiation must travel prior to detection.

verse region to generate process signals; wherein more than one process signal is generated for each of said material items, each process signal being commensurate with the amount of penetrating electromagnetic radiation passing through a portion of each material item which is different from any other portion of said material item, and *selecting for processing those of said process signals which do not pass through irregularities in the bodies of said material items*; and

(e) simultaneously analyzing said process signals to cause said process signals to actuate means for directing said items to a different destination commensurate with the amount of said penetrating electromagnetic radiation passing through each of said corresponding material items.

(emphasis added).

On February 9, 1996, NRT filed a complaint against MSS in the United States District Court for the Middle District of Tennessee alleging that MSS infringed several of NRT's patents related to the automatic classification and separation of recyclable plastic materials. MSS defended by arguing that the patents at issue were invalid under 35 U.S.C. §§ 101–103 and 112. On October 27, 1997, the parties stipulated that only claims 1–8 and 10 of the '576 patent remained at issue, and the other asserted patents and the remainder of the claims of the '576 patent were dropped from the litigation. On October 29, 1997, the district court issued a Memorandum and Order granting MSS's motion for summary judgment that concluded that claim 1 of the '576 patent was invalid for lack of enablement under 35 U.S.C. § 112, paragraph 1. On November 7, 1997, the district court entered an Agreed Final Order that the asserted dependent claims 2–8 and 10, the remainder of the claims at issue in the case, were also invalid for lack of enablement because claims 2–8 and 10 incorporate claim 1 by reference pursuant to 35 U.S.C. § 112, paragraph 4.

## DISCUSSION

On appeal, NRT argues that the district court erred in holding claims 1–8 and 10 invalid under § 112, paragraph 1 for two reasons. NRT asserts that the district court erred in its construction of the term "selecting" in claim 1. NRT also asserts that the district court erroneously required the claimed invention to work perfectly under all circumstances. We have jurisdiction over this appeal under 28 U.S.C. § 1295(a)(1) (1994).

### 1. Standard of Review

We review the district court's grant of summary judgment *de novo*, with all justifiable factual inferences being drawn in favor of the party opposing the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Additionally, we review the district court's claim construction *de novo*. *See Cybor Corp. v. FAS Technologies, Ltd.*, 138 F.3d 1448, 1456, 46 USPQ2d 1169, 1174 (Fed. Cir.1998) (en banc). Whether a claim is enabled under 35 U.S.C. § 112, paragraph 1 is a question of law, although based upon underlying factual findings. *See PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1564, 37 USPQ2d 1618, 1623 (Fed.Cir.1996); *In re Goodman*, 11 F.3d 1046, 1049–50, 29 USPQ2d 2010, 2013 (Fed.Cir.1993).

### 2. Claim Construction

NRT argues that the district court erred in incorporating its claim construction in its discussion of enablement and in interpreting claim 1 to require perfect isolation between those signals that pass through irregularities and those that do not. NRT argues that the term "select" means that only those signals that do not pass through irregularities are to be "preferred" to those signals that do. According to NRT, the term "select" does not require absolute perfection in separating signals that pass through an irregularity from those that do not. Because claim construction is a matter of law that we review *de novo*, we independently construe claim 1 of the '576 patent.

■ Claim interpretation begins with the language of the claim itself. *See Bell Communications Research, Inc. v. Vitalink Communications Corp.,* 55 F.3d 615, 619, 34 USPQ2d 1816, 1819 (Fed.Cir.1995). The claim terms are to be given their ordinary meaning unless it is apparent that the inventor intended to use them differently. *See York Prods., Inc. v. Central Tractor Farm & Family Ctr.,* 99 F.3d 1568, 1572, 40 USPQ2d 1619, 1622 (Fed.Cir.1996); *Quantum Corp. v. Rodime, PLC,* 65 F.3d 1577, 1580, 36 USPQ2d 1162, 1165 (Fed.Cir.1995). At issue on appeal is the construction of part (d) of claim 1, more specifically, the limitation that requires the claimed invention to "select[ ] for processing those of said process signals which do not pass through irregularities in the bodies of said material items." The parties agree that the ordinary meaning of the term "select" means *"chosen* in preference to another or others; *picked out,* especially for excellence or *some special quality; picked."* *Webster's New World Dictionary (3rd College Ed.)* (emphasis added).

The plain meaning of the term "select," including the dictionary meaning agreed upon by the parties, implies that some signals are to be picked or chosen and others are to be excluded based upon some special, unique or discrete quality. A specific choice is being made. Both claim 1 and the specification of the '576 patent make clear that those signals that do not pass through irregularities are to be chosen for processing to the exclusion of those signals that do pass through irregularities. Nothing in the plain and ordinary meaning of the term "select" indicates that only a preference for signals that do not pass through irregularities is required. Furthermore, nothing in claim 1 indicates that signals are to be picked based on any other characteristic than penetrating a "normal" or regular portion of a container. Claim 1 clearly indicates that the "special quality" for which a signal is selected is whether or not that signal has passed through an irregularity. There is no indication in the plain meaning of the limitation, or from the claim as a whole, that this selection criterion is to apply only some of the time.

Nothing in the specification indicates that the inventor intended to deviate from the plain and ordinary meaning of the word "select." Thus, the plain language of the claim when read in light of the specification is clear that the term "select" does not merely require a "preference" for certain signals. Signals are to be specifically chosen based on whether or not they pass through irregularities in the container.

### 3. Enablement under 35 U.S.C. § 112, Paragraph 1

■ Every patent is presumed valid. *See* 35 U.S.C. § 282 (1994). The presumption of validity includes a presumption that the patent complies with § 112. *See Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 941, 15 USPQ2d 1321, 1329 (Fed. Cir.1990). "Invalidity for lack of enablement is a conclusion of law and must be supported by facts proved by clear and convincing evidence...." *Id.* Because no genuine issues of material fact exist that preclude the grant of summary judgment on this issue, we determine, as a matter of law, whether the specification of the '576 patent satisfies the requirements of 35 U.S.C. § 112, paragraph 1 with respect to claim 1.

■ The first paragraph of 35 U.S.C. § 112 states:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The enablement requirement of § 112 demands that the patent specification enable "those skilled in the art to make and use the full scope of the claimed invention without 'undue experimentation.'" *Genentech, Inc. v. Novo Nordisk A/S,* 108 F.3d 1361, 1365, 42 USPQ2d 1001, 1004 (Fed.Cir.1997) (quoting *In re Wright,* 999 F.2d 1557, 1561, 27 USPQ2d 1510, 1513 (Fed.Cir.1993)); *see also In re Vaeck,* 947 F.2d 488, 495, 20 USPQ2d 1438, 1444 (Fed.Cir.1991). The enablement

requirement ensures that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims. The scope of the claims must be less than or equal to the scope of the enablement. The scope of enablement, in turn, is that which is disclosed in the specification plus the scope of what would be known to one of ordinary skill in the art without undue experimentation. *See Goodman*, 11 F.3d at 1050, 29 USPQ2d at 2013 ("the specification must teach those of skill in the art 'how to make and how to use the invention as broadly as it is claimed' ") (citing *Vaeck*, 947 F.2d at 496); *In re Fisher*, 57 C.C.P.A. 1099, 427 F.2d 833, 839, 166 USPQ 18, 24 (CCPA 1970) ("The scope of the claims must bear a reasonable correlation to the scope of enablement provided by the specification to persons of ordinary skill in the art.").

In the present case, the district court held that the written description of the '576 patent did not meet the strictures of § 112, paragraph 1. In particular, it held that one of ordinary skill in the art could not "select[ ] for processing those of said process signals which do not pass through irregularities in the bodies of said material items" without undue experimentation because the written description did not explain how to distinguish between signals that passed through irregular portions of the container and those that did not. *See National Recovery Techs. v. Magnetic Separation Sys.*, No. 3–96–0154, slip op. at 12 (M.D.Tenn. Oct. 29, 1997). The district court had sufficient evidence, including the testimony of one of the inventors, from which it found that NRT failed to determine where irregularities existed in the container. *See id.* at 10. The district court concluded that the specification merely instructed one of ordinary skill in the art to select those signals with the highest transmission measurements, not to select those signals that did not pass through irregularities as required by claim 1. *See id.* at 12.

■ NRT argues that the district court erred because it required the disclosed embodiment to work perfectly under all circumstances. According to NRT, the district court misinterpreted our decision in *In re Wright*, 999 F.2d 1557, 27 USPQ2d 1510

(Fed.Cir.1993) to require enablement under all possible conditions. NRT is indeed correct that a claim is not invalid for lack of *operability* simply because the invention does not work perfectly under all conditions. *See Hildreth v. Mastoras*, 257 U.S. 27, 34, 42 S.Ct. 20, 66 L.Ed. 112 (1921) ("The machine patented may be imperfect in its operation; but if it embodies the general principle and works … it is enough."); *Decca, Ltd. v. United States*, 210 Ct.Cl. 546, 544 F.2d 1070, 191 USPQ 439 (Ct.Cl.1976) ("The mere fact that the system has some drawbacks, or that under certain postulated conditions it may not work … does not detract from the operability of the disclosed equipment to perform its described function."). However, NRT is incorrect in its characterization of the district court's ruling on enablement as requiring perfect operation from the patented process.

■ Whether a patented device or process is operable is a different inquiry than whether a particular claim is enabled by the specification. In order to satisfy the enablement requirement of § 112, paragraph 1, the specification must enable one of ordinary skill in the art to practice the *claimed* invention without undue experimentation. Thus, with respect to enablement the relevant inquiry lies in the relationship between the specification, the claims, and the knowledge of one of ordinary skill in the art. If, by following the steps set forth in the specification, one of ordinary skill in the art is not able to replicate the claimed invention without undue experimentation, the claim has not been enabled as required by § 112, paragraph 1.

The case before us presents a classic example of a claim that is broader than the enablement as taught in the specification. The specification of the '576 patent first acknowledges the problem: sometimes radiation intensity readings are misleading because the radiation has passed through abnormally thick portions of the scanned container. The ideal solution to this problem is clear: discard intensity measurements taken through irregularities and use only those measurements taken through the regular portions of the container. Claim 1 claims this ideal solution in the

step of "selecting for processing those of said process signals which do not pass through irregularities in the bodies of said material items." However, the specification of the '576 patent does not describe how to perform this ideal selection step. Rather, the specification instructs one of ordinary skill in the art to "use only those measurements of highest transmission rate through the item. . . ." '576 Patent, col. 3, ll. 40–41. The last sentence of the written description states that:

> the most reliable measurements for making a classification are those measurements taken through those portions of the body of an item to be classified which exhibit the greatest rates of transmission of radiation through the item (such as those taken through a relatively thin cross section such as through an unfolded central portion of the container).

'576 Patent, col. 6, ll. 52–58. The specification is clear that in order to obtain the most reliable measurements, a good proxy for intensity measurements that do not pass through irregularities are those measurements with the highest transmission rates. However, enabling a proxy for the claimed invention is not the same as enabling the claimed invention itself.

While the written description does enable one of ordinary skill in the art to approximate the claimed function, this is not the same as enabling one of ordinary skill in the art to perform the actual selection step of claim 1 for which NRT claims patent protection. The written description does not at all purport to enable one of ordinary skill in the art to determine where irregularities exist in the containers. In fact, the '576 patent specification points out that equipment limitations make an actual determination of the location of regular and irregular portions infeasible. It states:

> We have found that, in practice, taking a measurement through only a relatively thin cross section of an item requires detailed knowledge of the geometry and orientation of the item (such as a container). Accordingly, placement of an item between a radiation source and a radiation detector such that radiation passing only through a

relatively thin cross section is measured requires sophisticated and expensive materials handling means.

'576 Patent, col. 3, ll. 16–24. NRT argues that "[w]hile as a theoretical possibility it might be feasible to construct a system that ignores every single perturbation and flaw in virtually all of the items processed, the '576 patent discloses and claims a workable, practical system, not a theoretical possibility." However, as we have explained above, claim 1 broadly claims exactly this theoretical possibility that NRT admits is not disclosed in the specification of the '576 patent.

■ The record before us does not support NRT's contention that one of ordinary skill in the art would be able to construct a machine that is capable of selecting signals based on whether the signals pass through container irregularities without undue experimentation. While the necessity of some experimentation does not preclude enablement, the experimentation must not be unduly extensive. *See PPG Industries,* 75 F.3d at 1564, 37 USPQ2d at 1618. Whether making and using the claimed invention would have required undue experimentation is a legal conclusion based upon underlying facts. *See Genentech,* 108 F.3d at 1365, 42 USPQ2d at 1004 (citing *In re Wands,* 858 F.2d 731, 735, 736–37, 8 USPQ2d 1400, 1402, 1404 (Fed.Cir. 1988)).

The record shows that as of October 29, 1990, the date the '576 patent was filed, there was no known way for one of ordinary skill in the art of materials processing to distinguish x-ray readings which passed through bottle irregularities from those x-ray readings which did not pass through irregularities. The record moreover indicates that as of the time the '576 patent was filed, even one of the listed inventors of the patent, Dr. Sommers, believed that additional research, development, and experimentation needed to be conducted before a device could be built that would practice the invention as claimed – a device that would selectively identify signals based on whether they passed through sample irregularities. During his deposition testimony, Dr. Sommers was asked if the '576 patent described any method, technique or algorithm that would tell someone how to

determine where irregularities existed in the items to be sorted. Dr. Sommers replied that he believed "what the patent discloses is the need, as a method, to determine that irregularity in the bottle" and at the time the '576 patent was filed, NRT "did not know particularly how to do that .... [and was] still developing that process." Dr. Sommers further noted that although analyzing the signal transmission measurements would give an indication of where irregularities might exist in the samples being sorted, if "the complete bottle is an irregularity ... you're not going to get good readings...."

The '576 patent therefore recognizes a specific need in the materials sorting field and suggests a theoretical answer to that need. It provides a starting point from which one of skill in the art can perform further research in order to practice the claimed invention, but this is not adequate to constitute enablement. *See Genentech*, 108 F.3d at 1366, 42 USPQ2d at 1005. The specification of the '576 patent therefore does not enable one of ordinary skill in the art to practice the full scope of the invention embodied in claim 1 without undue experimentation. The most that NRT can be credited with is promising the ideal result in claim 1, even though the specification does not completely deliver on this promise.

## CONCLUSION

Because the specification of the '576 patent does not enable one of ordinary skill in the art to practice the invention embodied in claim 1 without undue experimentation, we affirm the district court's grant of MSS's motion for summary judgment that claim 1 is not enabled and thus invalid under 35 U.S.C. § 112, paragraph 1. Because dependent claims 2–8 and 10 stand or fall with independent claim 1, we affirm the district court's judgment that these claims are also invalid under 35 U.S.C. § 112, paragraph 1.

*AFFIRMED.*

## COSTS.

Each party to bear its own costs.